**J. M. EDWARDS, Plaintiff,**

v.

**SOUTHERN RAILWAY COMPANY,**
**Defendant.**

**Civ. No. 551.**

United States District Court
E. D. North Carolina,
New Bern Division.
May 20, 1966.

Jones, Reed & Griffin, Kinston, N. C., for plaintiff.

Thomas J. White, Kinston, N. C., and William T. Joyner, Raleigh, N. C., for defendant.

## OPINION and ORDER

LARKINS, District Judge:

### SUMMARY

This cause comes before the Court as a civil action founded in contract. The contract was allegedly based on certain employee protective provisions embodied in various orders issued by the Interstate Commerce Commission.

The action was begun in the Superior Court of Lenoir County, North Carolina, by the plaintiff, who is a former employee of Atlantic and East Carolina Railroad Company (hereinafter referred to as Atlantic). Plaintiff brought the suit against Atlantic, a corporation chartered under the laws of the State of North Carolina, and against the Southern Railway Company (hereinafter referred to as Southern), a Virginia corporation. The action was thereafter removed to this Court after plaintiff took a voluntary judgment of nonsuit against Atlantic, the North Carolina defendant.

Jurisdiction is, therefore, based on diversity of citizenship and requisite statutory amount in controversy.

The Court proceeded to hear the testimony of the parties and witnesses without the intervention of a jury at the November 29, 1965 Term of this Court at New Bern, North Carolina. Interrogatories, exhibits and depositions were also entered in the record for consideration by the Court. Counsel then offered memorandum of facts and law, which have been considered by the Court. The nature of the case is as follows, as is developed from all that entered into the record, and as appears from the arguments of counsel.

Plaintiff insists that Southern and Atlantic contracted together to protect the employment interests of plaintiff at the time defendant was authorized by the Interstate Commerce Commission to acquire the controlling stock interests of Atlantic. This employment protective provision agreement was made a part of the Interstate Commerce Commission proceedings and orders.

Plaintiff states that he was discharged by Southern on October 15, 1957, as a result of Southern's acquisition of Atlantic. He contends his discharge was in violation of the terms of the employee protective provisions which are part of the Interstate Commerce Commission Order allowing the acquisition. The plaintiff prays for the recovery of a monetary judgment as compensation for lost salary, together with interest, damages for lost property as a result of his decreased income, attorneys' fees and the costs of the action.

Defendant has answered denying plaintiff was subject to the benefits of the employees' protective agreement because he was not an employee of Atlantic. Defendant insists plaintiff was

an officer of Atlantic and not an employee within the meaning of the term "employee" as used by the Interstate Commerce Commission in its order and amended order allowing the acquisition of Atlantic by Southern.

## FINDINGS OF FACT

Atlantic operates carrier properties under a lease from the Atlantic and North Carolina Railroad Company, the lease expiring in 1994. The Atlantic interests extend from Goldsboro, North Carolina, to Morehead City, North Carolina, an Atlantic Ocean port. This is an operation extending over a distance of some ninety-six miles.

On October 22, 1954, Southern filed a petition with the Interstate Commerce Commission wherein it sought to acquire control of Atlantic and its leasehold interests. This seeking of control of Atlantic was to be accomplished through the acquisition of Atlantic's capital stock. Approval of the acquisition was sought by the parties pursuant to the provisions of Section 5(2) of the Interstate Commerce Act, Title 49 U.S.C.A. Sec. 5(2).

Section 5(2) of the Act provides in pertinent parts:

> *"Unifications, mergers, and acquisitions of control.*
>
> "(a) It shall be lawful, with the approval and authorization of the Commission, as provided in subdivision (b) of this paragraph—
>
> "(i) for two or more carriers to consolidate or merge their properties or franchises, or any part thereof, into one corporation for the ownership, management, and operation of the properties theretofore in separate ownership; or for any carrier, or two or more carriers jointly, to purchase, lease, or contract to operate the properties, or any part thereof, of another; or * * * to acquire control of another through ownership of its stock or otherwise; . . . or
>
> \*   \*   \*   \*   \*   \*
>
> "(f) As a condition of its approval, under this paragraph, of any transaction involving a carrier or carriers by railroad subject to the provisions of this chapter, the Commission shall require a fair and equitable arrangement to protect the interests of the railroad employees affected. In its order of approval the Commission shall include terms and conditions providing that during the period of four years from the effective date of such order such transaction will not result in employees of the carrier or carriers by railroad affected by such order being in a worse position with respect to their employment * * *."

This acquisition through purchase of stock was ultimately approved by the Interstate Commerce Commission on September 19, 1957. Certain prescribed conditions for the protection of the interests of Atlantic employees who might be adversely affected as a result of the acquisition were imposed upon Southern, as required by the above-stated statute. The effective date of the Commission's Order allowing the acquisition was February 27, 1957.

Subsequently, by a Supplemental Order dated September 29, 1958, the Commission replaced the employee protective provisions it had originally imposed, and which were known as the "Northwestern Conditions" (from Chicago N. W. Ry. Co. Merger, 261 I.C.C. 672 (1946)), with conditions the Commission had imposed in Oklahoma Ry. Co. Trustees Abandonment, 257 I.C.C. 177 (1944), and known as the "Oklahoma conditions."

> "4. If, as a result of the abandonment of operation herein permitted and the purchases et cetera, herein authorized, hereinafter referred to as the transaction, any employee * * * is displaced, that is, placed in a worse position with respect to his compensation and rules governing his work conditions, and so long thereafter as he is unable, in the exercise of his seniority rights under existing agreements, rules, and practice, to obtain a position producing compensation equal to or exceeding the compensation he received in the position from which

he was displaced, he shall be paid a monthly displacement allowance equal to the difference between the monthly compensation received by him in the position in which he is retained and the monthly compensation received by him in the position from which he was displaced. The latter compensation is to be determined by dividing separately by 12 the total compensation received by the employee and the total time for which he was paid during the last 12 months in which he performed services immediately preceding the date of his displacement as a result of this transaction (thereby producing average monthly compensation and average monthly time paid for in the test period). If his compensation in his retained position in any month is less than the aforesaid average compensation in the test period, he shall be paid the difference, less compensation at the rate of the position from which he was displaced for time lost on account of his voluntary absences in his retained or current position, but if in his retained position he works in any month in excess of the average monthly time paid for in the test period, he shall be compensated for the excess time at the rate of pay of the retained position; provided, however, that nothing herein shall operate to affect in any respect the retirement on pension or annuity rights and privileges in respect of any employee; provided, further, that if any employee elects not to exercise his seniority rights he shall be entitled to no allowance * * *. The period during which this protection is to be given, hereinafter called the protective period, shall extend from the date on which the employee was displaced to the expiration of 4 years from the effective date of our order herein * * *.

"5. If, as a result of the transaction herein approved, any employee, hereinafter referred to as a dismissed employee, of the carriers is deprived of employment with said carriers because of the abolition of his position or the loss thereof as the result of the exercise of seniority rights by an employee whose position is abolished as result of the transaction herein approved, he shall be accorded a monthly dismissal allowance equivalent to one-twelfth of the compensation received by him in the last 12 months of his employment in which he earned compensation prior to the date he is first deprived of employment as a result of this transaction. This allowance shall be made during the protective period to each dismissed employee while unemployed * * *.

"The dismissal allowance of any dismissed employee who is otherwise employed shall be reduced to the extent that his combined monthly earnings in such other employment, any benefits received under any unemployment insurance law, and his dismissal allowance exceed the amount upon which his dismissal allowance is based. Such employee, or his representative, and the carriers, should agree upon a procedure by which the carriers shall be currently informed of the wages earned by such employee in employment other than with the carriers, and the benefits received.

"The dismissal allowance shall cease prior to the expiration of the protective period in the event of the failure of the employee without good cause to return to service after being notified by the carriers of a position, the duties of which he is qualified to perform and for which he is eligible, or in the event of his resignation, death, retirement on pension, or dismissal for good cause."

Plaintiff was employed by Atlantic as car accountant in October of 1941, and he remained in that position with Atlantic until October 15, 1957. His duties as car accountant consisted of keeping records of all railroad cars interchanged to Atlantic and operated over Atlantic's lines. He was being compensated for performing these duties at a rate of $350.00 per month at the time of his discharge.

Plaintiff had a clerk, his wife, to assist him in performing his duties as car accountant. He had no authority to hire or fire her. He had no supervisory authority over any other employees of Atlantic.

Defendant concedes plaintiff was discharged as of October 15, 1957, due to Southern's removing the duties of Atlantic's car accountant from Atlantic's home offices in New Bern to the Southern offices in Atlanta, Georgia, where Southern maintained its own car accountant offices.

As car accountant, plaintiff's name was carried in the Railroad Guide, along with the names of officers and officials of Atlantic. It is entirely unreasonable, however, for experienced railroading men to draw the inference from this listing in the Railroad Guide that a car accountant was an officer and official of the railroad.

It is well known in railroad circles that car accountants are listed by railroad companies in the Railroad Guide so that they might be readily identified and contacted by their counterparts throughout the industry when the need arises.

The annual report of Atlantic, filed with the North Carolina Utilities Commission, clearly indicates plaintiff was not an officer, nor had he any official capacity as a general officer or director of Atlantic. In fact, it appears that he did not hold any shares of security interests in Atlantic although he was the brother of the president and general manager of Atlantic, H. P. Edwards (Defendant's Exhibit #5). These facts were known to defendant, or should have been, at the time of the acquisition by it of Atlantic, and at the time of discharge.

## CONCLUSIONS OF LAW

Plaintiff was an employee of Atlantic within the meaning of the "Oklahoma conditions" which were imposed upon Southern by the Order of the Commission, according to the provisions of Section 5(2) (f) of the Act. It is further conceded by Southern that his job with Atlantic was abolished after the acquisition.

In determining when one is an employee or an official, under the Railway Labor Act, one must look to the facts of each case. The Commission aptly stated In The Matter of Regulations Concerning The Class of Employees And Subordinate Officials To Be Included Within The Term "Employee" Under The Railway Labor Act, 266 I.C.C. 85, @ 92 (1946), the following:

"However, in the final analysis rank and title are not controlling in defining the work of subordinate officials, and we are unable to conclude that there is any fixed outstanding factor which will always control, without exception. We do not believe that as a practical matter it is feasible to make a definite line of demarcation between the work of subordinate officials and that of officials * * *. Each proceeding, therefore, must of necessity be decided upon the record * * *."

And so this is what has been done in this case.

The above-quoted decision was rendered in affirming prior Commission decisions which held such titles as roadmaster (in 263 I.C.C. 607), general roadmaster, general foreman, supervisor of bridges and buildings, and supervisors and inspectors of signals, and their various assistants (in 264 I.C.C. 239) were all "employees" for purposes of receiving protection under the Railway Labor Act.

The Commission must "require a fair and equitable arrangement to protect the interests of the railroad employees affected." (Sec. 5(2) (f)) It has done so through implementation of the "Oklahoma conditions." Defendant will not be allowed to defeat the clear intent of the Act by guise and indirection.

It is, therefore, clear that it could not be reasonably asserted that plaintiff was an officer or serving in an official capacity of Atlantic, when his

sole duty was that of a car accountant. The defendant has asserted a frivolous and totally non-meritorious defense causing plaintiff to incur unnecessary expenses. Section 5(2) (f) of the Act, and the "Oklahoma conditions" were specifically designed to alleviate the situation in which plaintiff found himself.

### ORDER

Therefore, it is ordered that plaintiff's prayer for monetary relief and for reasonable attorneys' fees be, and the same is hereby allowed.